**Domingo ARANGO MARQUEZ, Petitioner–Appellant,**

v.

**IMMIGRATION AND NATURALIZATION SERVICE, Respondent–Appellee.**

**No. 01–17191.**

United States Court of Appeals, Ninth Circuit.

Argued and Submitted Oct. 11, 2002.

Filed Sept. 19, 2003.

Daniel J. Broderick, Chief Assistant Federal Defender, Gillian Black, Staff Attorney, Federal Defender, Sacramento, CA, for the Appellant.

Shelley R. Goad, Attorney, Office of Immigration Litigation, Civil Division, United States Department of Justice, Washington, DC, for the Appellee.

Before D.W. NELSON, BEEZER, and McLANE WARDLAW, Circuit Judges.

Opinion by Judge WARDLAW; Concurrence by Judge BEEZER

### OPINION

WARDLAW, Circuit Judge.

Domingo Arango Marquez is a Mariel Cuban refugee subject to indefinite detention by the Immigration and Naturalization Service ("INS") since August 16, 2000, because his country of origin will not accept his repatriation. Because he is an "excluded alien" under the former immigration law or an "inadmissible alien" under the Illegal Immigration Reform & Immigrant Responsibility Act of 1996 ("IIRIRA"), the district court held that the presumptively reasonable period of six months post-removal detention under 8 U.S.C. § 1231 established in *Zadvydas v. Davis*, 533 U.S. 678, 700, 121 S.Ct. 2491, 150 L.Ed.2d 653 (2001) for admitted aliens is inapplicable to Marquez's case and denied his habeas corpus petition. Because we have since extended the statutory construction of § 1231 in *Zadvydas* to embrace aliens deemed inadmissible under 8 U.S.C. § 1182, *Lin Guo Xi v. INS*, 298 F.3d 832, 833–34 (9th Cir.2002), we hold that Marquez is entitled to a determination whether his removal to Cuba is reasonably foreseeable and to release, subject to appropriate supervised conditions of release, if it is not.

### I.

Marquez is a native and citizen of the Republic of Cuba. Born in Havana May 12, 1957, he sought to emigrate as he became opposed to its Communist government. In early April of 1980, Marquez entered the Peruvian embassy compound in Havana, hoping to obtain political asylum and to resettle in Peru. He remained at the Peruvian embassy for over a week amid a

growing crowd of refugees. On April 14, 1980, United States President Jimmy Carter ordered an airlift of up to 3500 of the refugees at the Peruvian embassy pursuant to the Refugee Act of 1980. *See* Refugee Act of 1980, Pub.L. No. 96–212, 94 Stat. 102. When President Carter's announcement of the airlift was broadcast by radio to the refugees in the embassy, Marquez decided to attempt resettlement in the United States instead of Peru. Soon thereafter, Cuban leader Fidel Castro ended the airlift program and announced that anyone who wished to leave Cuba was free to do so from the harbor at Mariel, a port city west of Havana. Marquez joined approximately 125,000 other Cubans who sailed from Mariel bound for the United States. He and other native Cubans who arrived in the United States with Castro's permission via Mariel during this period (April 15, 1980 to October 20, 1980) became known as Mariel Cubans.

Marquez arrived in Key West, Florida aboard a ship called the *San Juan* on May 18, 1980, according to the asylum application he filed that day. Because he had no criminal record and was not otherwise inadmissable, he was immediately paroled into the United States.

Marquez initially settled in Florida, and later moved to California, supporting himself, his wife, and his daughter by working in automobile repair shops. Unfortunately, he next embarked on a criminal career. In 1989, he was convicted of burglary and sentenced to eighteen months in prison, of which he served nine. He was then placed in INS custody pending exclusion proceedings. Marquez became subject to the "entry fiction" in immigration law. Because he was paroled into the United States,

even though he was physically present here, pending an admissibility determination he is deemed "excluded." " '[S]uch aliens are legally considered to be detained at the border and hence as never having effected entry into this country.' " *Barrera–Echavarria v. Rison*, 44 F.3d 1441, 1450 (9th Cir.1995) (en banc) (quoting *Gisbert v. United States Attorney Gen.*, 988 F.2d 1437, 1440 (5th Cir.), *amended*, 997 F.2d 1122 (1993)). On June 4, 1990, an Immigration Judge ordered him excluded and deported, and denied his application for asylum. He did not appeal these determinations to the Board of Immigration Appeals. Pursuant to the Cuban Review Plan, 8 C.F.R. § 212.12, which provides procedures and criteria for an annual parole review of excluded Mariel Cubans, Marquez was detained for three more years before being paroled again into the United States.

Although we lack a precise record of Marquez's criminal activities during his immigration parole from 1993 to 1997, Marquez apparently committed several more crimes during this five-year period.[1] He was convicted of grand theft (a felony) on December 9, 1997, and paroled into the United States again on June 7, 1999. On December 1, 1999, a California state court convicted him of possession of methamphetamine, and sentenced him to sixteen months in prison, of which he served nine. In preparation for his impending release, the INS reviewed his file and preliminarily recommended that he again be paroled. He was returned to INS custody on August 16, 2000. Four days later, an INS supervisor overruled the initial parole recommendation. Since then, Marquez has remained in INS detention at various pe-

---

1. A December 12, 2000 Final Notice of Parole Denial notes that Marquez had been convicted of grand theft on at least four separate occasions, burglary of a dwelling, burglary of a structure, possession of burglary tools, evading an officer, and possession of a controlled substance on at least two separate occasions.

nal facilities. He is currently housed in the federal prison in Lompoc, California. Because Cuba will not accept his repatriation, he is presently subject to indefinite detention by the INS.

On September 26, 2000, more than ten years after he was ordered deported, Marquez petitioned for habeas corpus in the United States District Court for the Eastern District of California, alleging that his indefinite confinement violates the constitution, laws, or treaties of the United States. While Marquez's habeas petition and motion for appointment of counsel were pending before the district court, his detention was reviewed pursuant to the Cuban Review Plan and parole was again denied.

After a series of procedural fits and starts, including the appointment and termination of appointed counsel for Marquez, the magistrate judge recommended, and the district court adopted, the conclusion that Marquez's habeas petition be denied. The courts reasoned that we had held that excludable aliens may be detained indefinitely, *Barrera–Echavarria v. Rison,* 44 F.3d at 1450, and thus Marquez possesses no constitutional right to be free from detention. Following the Supreme Court's announcement in *Zadvydas,* 533 U.S. 678, 121 S.Ct. 2491, 150 L.Ed.2d 653, and its companion case, *Ashcroft v. Ma, id.,* the district court entered a subsequent order rejecting Marquez's contention that *Zadvydas* required his release as a matter of statutory construction, as opposed to due process, reasoning that *Zadvydas's* implicit limitation on post-removal order detention did not apply to excluded aliens. The district court did not have the benefit of our 2002 decision in *Lin Guo Xi,* 298 F.3d 832, which held that for purposes of construing the indefinite detention authorization in 8 U.S.C. § 1231(a)(6), inadmissible aliens are entitled to the same reason-

able time limitations as deportable aliens. Marquez's timely appeal thus presents the question whether IIRIRA § 1231(a)(6) as subsequently interpreted by the Supreme Court in *Zadvydas* and by us in *Lin Guo Xi,* applies to him.

## II.

■ The INS argues, as it did unsuccessfully in the district court, that we lack jurisdiction to entertain Marquez's habeas challenge to his continued detention because he failed to exhaust his administrative remedies as to the 1990 determination of excludability. While the INS is correct that former INA § 106(c) precludes review of orders of deportation or exclusion if the alien fails to exhaust his available administrative remedies, this argument misses the point.

As the district court correctly recognized, Marquez "challenges neither the Attorney General's power to exclude him nor his authority to revoke his immigration parole and detain him pending exclusion. Rather, he contends that the INS lacks the authority to detain him indefinitely, and that such detention violates his rights to substantive and procedural due process," and, since *Zadvydas,* 8 U.S.C. § 1231. Thus, Marquez's claim does not implicate former INA § 106(c). Rather, Marquez's 28 U.S.C. § 2241 habeas petition challenges the government's present right to detain him indefinitely. The district court has jurisdiction over this habeas claim. *Zadvydas,* 533 U.S. at 688, 121 S.Ct. 2491("We conclude that § 2241 habeas corpus proceedings remain available as a forum for statutory and constitutional challenges to post-removal-period detention."); *Magana–Pizano v. INS,* 200 F.3d 603, 610 (9th Cir.1999) ("The plain language of 28 U.S.C. § 2241 provides an unambiguous grant of jurisdiction to the district courts....").

■ Even if Marquez's claim required administrative exhaustion, the district court properly waived exhaustion, because the exhaustion requirement in § 2241 cases is prudential, rather than jurisdictional. As explained in *Castro–Cortez v. INS:*

> District courts are authorized by 28 U.S.C. § 2241 to consider petitions for habeas corpus. That section does not specifically require petitioners to exhaust direct appeals before filing petitions for habeas corpus. However, we require, as a prudential matter, that habeas petitioners exhaust available judicial and administrative remedies before seeking relief under § 2241.... [T]he exhaustion requirement in § 2241 cases is subject to waiver because it is not a "jurisdictional" prerequisite. Our conclusion that it is not "jurisdictional" is based on the fact that exhaustion is not required by statute.

239 F.3d 1037, 1047 (9th Cir.2001). *Castro–Cortez* emphasized that the requirements of § 2241 are not to be confused with § 2254. *See id.* at 1047 n. 11 ("In contrast, 28 U.S.C. § 2254, which governs habeas corpus petitions filed by petitioners in state custody, specifically requires that petitioners exhaust other avenues of relief.").

■ We have jurisdiction pursuant to 28 U.S.C. §§ 1291 and 2241 and review the district court's denial of Marquez's petition de novo. *See Baeta v. Sonchik,* 273 F.3d 1261, 1263(9th Cir.2001).

### III.

■ It would thus appear that *Zadvydas* and *Lin Guo Xi* compel a similar outcome here. The INS introduces a new wrinkle to this seemingly obvious analysis, however, by urging that the removal and detention statute at issue in those cases, 8 U.S.C. § 1231(a)(6), enacted in 1996 as part of IIRIRA, does not apply to Marquez's case because his order of exclusion became final pre-IIRIRA. This situation is in contrast to that of Lin Guo Xi, whose deportation order postdated IIRIRA, and thus, the government argues, Marquez's detention under former 8 U.S.C. § 1226(e) may be continued indefinitely under our decision in *Barrera–Echavarria,* 44 F.3d 1441.

The question we must address, therefore, is whether Marquez's indefinite detention[2] is authorized by the version of the INA in effect between 1990 and 1995, during which time Marquez was ordered excluded and deported, as the government urges, or by the amendments in IIRIRA which substantially altered our nation's immigration constructs.

By way of background, pre-IIRIRA law provided for a six-month period for the INS to effect the departure of an alien subject to a final deportation order, during

---

**2.** Marquez's continued detention is administratively reviewed at least annually under the Cuban Review Plan. *See* 8 C.F.R. § 212.12. The Cuban Review Plan provides that a detainee may be recommended for parole based on a review of his record and, if the detainee is not then recommended for release, a personal interview. Parole is not granted unless the Plan director or a Plan panel concludes that the detainee is presently non-violent, likely to remain non-violent, not likely to pose a threat to the community upon release, and not likely to violate parole conditions. *See id.*

§ 212.12(d)(2). Section 212.12 sets forth the following factors to be weighed in the parole determination: (1) the nature and number of disciplinary infractions or incident reports while in custody; (2) criminal history; (3) mental health reports; (4) progress in work, educational, or vocational programs; (5) ties to the United States, such as resident relatives; (6) likelihood of absconding; and (7) other information relevant to likely adjustment to community, participation in criminal activity, or violation of parole. *Id.* § 212.12(d)(3).

which time the INS could detain the alien. *See* 8 U.S.C. § 1252(c) (1994) (repealed 1996). After this six-month removal period, pre-IIRIRA law generally required the release of aliens, subject to supervised conditions. *See id.* at § 1252(d). Former 8 U.S.C. § 1226(e), however, authorized indefinite detention of an excluded alien convicted of an aggravated felony beyond the statutory removal period codified in § 1252(c).[3] *See Alvarez–Mendez v. Stock,* 941 F.2d 956, 961 (9th Cir.1991) ("When read in the context of the whole 1990 Act, it is clear that [former § 1226(e)] is part of a scheme requiring the Attorney General to detain all aliens convicted of aggravated felonies whose release would pose a threat to society."); *see also Barrera–Echavarria,* 44 F.3d at 1446–47 (citing *Alvarez–Mendez,* 941 F.2d at 962, for the proposition that "[former] § 1226(e) expressly authorized the alien's prolonged detention"). Similarly, former § 1252(a)(2)(B) authorized continued detention, beyond the removal period, of a lawfully admitted alien convicted of an aggravated felony who was unable to "demonstrate[ ] to the satisfaction of the Attorney General that [he] is not a threat to the community and that [he] is likely to appear before any scheduled hearings." 8 U.S.C. § 1252(a)(2)(B); *see also Alvarez–Mendez,* 941 F.2d at 961.

In enacting 8 U.S.C. § 1231(a)(1)(A) as part of IIRIRA, Congress shortened the removal period previously found at former § 1252(c) to ninety days. *See Zadvydas,* 533 U.S. at 701, 121 S.Ct. 2491. Detention during the removal period is mandatory. *See* 8 U.S.C. § 1231(a)(2) ("During the removal period, the Attorney General shall detain the alien. Under no circumstances during the removal period shall the Attorney General release an alien who has been found inadmissible ... or deportable [on certain specified grounds]."). IIRIRA also contained a new statutory provision, § 1231(a)(6), that consolidated authorization for the INS to detain beyond the removal period all types of aliens who are subject to final orders of removal, thus eliminating the bifurcated approach to post-removal order detention under pre-IIRIRA law. Section 1231(a)(6) provides:

> An alien ordered removed who is inadmissible under section 1182 of this title, removable under section 1227(a)(1)(C), 1227(a)(2), or 1227(a)(4) of this title or who has been determined by the Attorney General to be a risk to the community or unlikely to comply with the order of removal, may be detained beyond the removal period and, if released, shall be subject to the terms of supervision in paragraph (3).

8 U.S.C. § 1231(a)(6).

Section 1231(a)(6) does not authorize indefinite post-removal period detention, but

---

**3.** Former § 1226 was entitled "Exclusion of aliens." Subsection (e) provided:

(1) Pending a determination of excludability, the Attorney General shall take into custody any alien convicted of an aggravated felony upon release of the alien (regardless of whether or not such release is on parole, supervised release, or probation and regardless of the rearrest or further confinement in respect of the same offense).

(2) Notwithstanding any other provision of this section, the Attorney General shall not release such felon from custody unless the Attorney General determines that the alien may not be deported because the condition described in section 1253(g) of this title exists.

(3) If the determination described in paragraph (2) has been made, the Attorney General may release such alien only after—

(A) a procedure for review of each request for relief under this subsection has been established,

(B) such procedure includes consideration of the severity of the felony committed by the alien, and

(C) the review concludes that the alien will not pose a danger to the safety of other persons or to property.

8 U.S.C. § 1226(e) (repealed 1996).

instead imposes an implied six-month limit on such detention, provided that removal is not reasonably foreseeable. *See Zadvydas*, 533 U.S. at 701–02, 121 S.Ct. 2491. Although *Zadvydas* specifically concerned deportable aliens, we explained in *Lin Guo Xi* that § 1231(a)(6)'s identical treatment of "individuals who are removable on grounds of inadmissibility and those removable on grounds of deportability" requires the extension of *Zadvydas's* holding to inadmissible aliens—i.e., those who would have been considered excludable under pre-IIRIRA law. *Lin Guo Xi*, 298 F.3d at 835.

Although the linchpin of the INS's argument is that pre-IIRIRA law controls Marquez's plight, whether to apply pre-or post-IIRIRA law to a continuing detention is not an issue that seemed to have troubled the *Zadvydas* Court. There the Supreme Court applied IIRIRA both to Zadvydas, who had been placed in deportation proceedings and ordered deported to Germany in 1994 (pre-IIRIRA's April 1, 1997 effective date) and to the companion case of *Ma*, in which the petitioner's final order of deportation appears to have been entered post-IIRIRA's effective date. *See Zadvydas*, 533 U.S. at 684–85, 121 S.Ct. 2491.

The Supreme Court's apparent view that the pre-or post-finality of the deportation orders there at issue was not worth discussion is perhaps explained by traditional principles of habeas jurisprudence, which give federal courts the "legal responsibility to review the lawfulness of an alien's continued detention." *Id.* at 700, 121 S.Ct. 2491; *see also Preiser v. Rodriguez*, 411 U.S. 475, 486, 93 S.Ct. 1827, 36 L.Ed.2d 439 (1973) (The fundamental assertion underlying a petition for habeas corpus is that the petitioner "is being unlawfully subjected to physical restraint."); *Fay v. Noia*, 372 U.S. 391, 401–02, 83 S.Ct. 822, 9 L.Ed.2d 837 (1963) (The writ's "root principle is that in a civilized society, government must always be accountable to the judiciary for a man's imprisonment: if the imprisonment cannot be shown to conform with the fundamental requirements of law, the individual is entitled to his immediate release."). Therefore, courts turn to the law in effect at the time the petition is considered.

We have previously recognized this principle in a case authorizing the continued detention of an excluded Mariel Cuban denied repatriation by Cuba under (then) new § 1226(e). *See Alvarez–Mendez*, 941 F.2d 956. There we explained:

> Although the new section 1226(e) does not retroactively authorize any of the Attorney General's acts accomplished prior to the amendment, we are concerned here only with the legality of Alvarez–Mendez's present detention. Because this case involves a petition for the writ of habeas corpus, and not a claim for damages for illegal detention, the only issue before us is whether Alvarez–Mendez's detention is illegal today.

*Id.* at 960. We thus held that "even if his detention was illegal prior to the 1990 Act, if that Act gives the Attorney General the authority to hold Alvarez–Mendez today, his present custody is not illegal and habeas corpus is not available." *Id.; accord Gisbert*, 988 F.2d at 1444 ("Although these amendments became effective after revocation of petitioners' immigration parole, they may properly be considered in this discussion because our concern is with the legality of petitioners' present detention.").

Similarly here, we do not examine the validity of Marquez's detention between 1990 and 1995; we must address the validity of his present detention. The Sixth Circuit, sitting *en banc*, addressed the identical question in *Rosales–Garcia v. Holland*, 322 F.3d 386 (6th Cir.), *cert. de-*

*nied,* —— U.S. ——, 123 S.Ct. 2607, 156 L.Ed.2d 627 (2003). There, as here, the government argued that IIRIRA was inapplicable because "pursuant to § 309(c), IIRIRA does not apply to aliens who were in exclusion or deportation proceedings prior to April 1, 1997." *Id.* at 401. Agreeing with the reasoning of *Alvarez–Mendez,* the Sixth Circuit rejected the government's argument to the extent that it was asserting that IIRIRA did not apply retroactively to aliens deported or excluded prior to its effective date. The Sixth Circuit reasoned that petitioners there, like Marquez,

> are not challenging the legality of their original detention—they are challenging the INS's authority to detain them now. Therefore, whether IIRIRA *retroactively* authorizes [petitioners'] detention is irrelevant; we need only assess whether IIRIRA *currently* authorizes their detention.

*Id.* at 402 (emphasis in the original).

The INS similarly urges us to hold that pursuant to § 309(c)(1), pre-IIRIRA law, i.e., former § 1226(e) and not current § 1231, applies to detention of excludable aliens whose immigration proceedings were initiated before April 1, 1997. Setting aside for the moment its inconsistency with traditional notions of habeas corpus, this argument also fails because it is inconsistent with the procedural nature of § 309(c)(1) as described by the Supreme Court and contrary to both the plain language and the legislative history of the provision itself.

Section 309(c)(1) sets forth a transitional rule providing an exception to IIRIRA's general effective date for those aliens whose orders of exclusion or deportation had not become final on April 1, 1997:

> Subject to the succeeding provisions of this subsection, in the case of an alien who is in exclusion or deportation pro-

ceedings before the title III–A effective date—

> (A) the amendments made by this subtitle shall not apply, and
>
> (B) the proceedings (including judicial review thereof) shall continue to be conducted without regard to such amendments.

IIRIRA § 309(c)(1), 110 Stat. at 3009–625 (codified at 8 U.S.C. § 1101 note). The plain language of § 309(c)(1) thus exempts from the application of IIRIRA only those aliens who are "in exclusion or deportation proceedings" before the effective date.

Moreover, as the Supreme Court has recognized, "[s]ection 309(c)(1) is best read as merely setting out the *procedural* rules to be applied to removal proceedings pending on the effective date of the statute." *INS v. St. Cyr,* 533 U.S. 289, 318, 121 S.Ct. 2271, 150 L.Ed.2d 347 (2001) (emphasis in the original). The Court reasoned:

> because "[c]hanges in procedural rules may often be applied in suits arising before their enactment without raising concerns about retroactivity," *Landgraf v. USI Film Prods.,* 511 U.S. 244, 275, 114 S.Ct. 1483 (1994), it was necessary for Congress to identify which set of procedures would apply in those circumstances.

*Id.*

The Court further relied upon the Conference Report, which expressly explains that 309(c) "provides for the transition to new *procedures* in the case of an alien already in exclusion or deportation proceedings on the effective date." *Id.* (emphasis in the original).

The Supreme Court's conclusion that § 309(c)(1) applies only to ongoing exclusion or deportation proceedings is bolstered by that provision's subsequent amendment by Congress. Less than two weeks after its initial passage, Congress

passed a technical correction to § 309(c)(1) replacing the words "as of" in the original version with the word "before," and eliminating a cross-reference to that provision in subsection (c)(4), which accelerated implementation of certain of IIRIRA's transitional rules for judicial review. *See* Extension of Stay in United States for Nurses, Pub.L. No. 104–302, § 2, 110 Stat. 3656, 3657 (Oct. 11, 1996). The legislative history of this technical amendment confirms Congress's intention that § 309(c) would permit the application of IIRIRA's transitional judicial review provisions to final orders of exclusion or deportation entered after October 30, 1996, but leave in place the pre-IIRIRA rules for judicial review of earlier exclusion or deportation orders:

> It was the clear intent of the conferees that, as a general matter, the full package of changes made by[the new judicial review portion of IIRIRA] effect [sic] those cases filed in court after the enactment of the new law, leaving cases already pending before the courts to continue under existing law.

> The conferees also intended, however, to accelerate the implementation of certain of [IIRIRA's judicial review] reforms....

> Unfortunately, a cross-reference in section 309(c)(4) could be read to suggest that implementation of the transitional changes in judicial review should be delayed until after [IIRIRA's] general effective date.

142 Cong. Rec. H12,293 (Oct. 4, 1996) (statement of Rep. Smith). Thus, Congress's amendment of § 309(c)(1) to clarify that it exempts from IIRIRA's new rules cases involving aliens in exclusion or deportation proceedings "before" IIRIRA's effective date has no bearing on concluded cases such as Marquez's, for which IIRIRA's judicial review rules are irrelevant.

The Supreme Court's interpretation of IIRIRA § 309(c)(1) is also consistent with the focus of the remaining subsections of IIRIRA § 309(c) on issues that are procedural in nature or arise only during ongoing proceedings, which would also be irrelevant in cases involving aliens whose orders of deportation or exclusion were final on the effective date. For example, subsection (c)(2) authorizes the Attorney General to elect to apply IIRIRA's new procedures in cases where an evidentiary hearing has not yet taken place. Similarly, subsection (c)(3) allows the Attorney General "to terminate proceedings in which there has not been a final administrative decision and to reinitiate proceedings" under IIRIRA. As already noted, subsection (c)(4) provides transitional rules for judicial review of cases "in which a final order of exclusion or deportation is entered more than 30 days after the date of [IIRIRA's] enactment," i.e., after October 30, 1996. The remainder of section 309(c)'s provisions also resolve potential procedural issues, governing uniform application of provisions concerning continuous residence and physical presence to Notices to Appear regardless of when issued, allowing the Attorney General to waive a new ground for inadmissibility, and limiting suspension of deportation and adjustment of status under INA § 244, 8 U.S.C. § 1254 (1994), *repealed by* IIRIRA § 308(b)(7). Finally, subsection (d)(2) directs that "any reference in law to an order of removal shall be deemed to include a reference to an order of exclusion and deportation or an order of deportation," thus reinforcing the interpretation that IIRIRA § 309 is intended to provide for unified immigration rules to the extent possible without interfering with ongoing proceedings. Nothing in IIRIRA § 309 or its legislative history suggests that Congress intended this limited exemption from IIRIRA's new rules to apply to de-

tention that, by definition, can occur only after an order of removal becomes final, i.e., at a time when proceedings and judicial review thereof, the very concern of IIRIRA § 309(c), have concluded.

The INS argues that we should defer to its construction of IIRIRA § 309(c)(1) despite its clear conflict with the plain language and history of the provision and Supreme Court jurisprudence. *Chevron* deference would be inappropriate even if there were some ambiguity in § 309(c)(1), however, because courts should only defer to " 'an agency's construction of the statute which it administers.'" *See INS v. Aguirre–Aguirre,* 526 U.S. 415, 424, 119 S.Ct. 1439, 143 L.Ed.2d 590 (1999) (quoting *Chevron U.S.A. Inc. v. Natural Resources Defense Council, Inc.,* 467 U.S. 837, 842, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984)). Section 309(c)(1) is not part of the immigration law that the INS administers. Instead, IIRIRA § 309(c)(1) designates the proper choice of immigration law during the transition from pre-IIRIRA to IIRIRA law, thus making that provision particularly suited to judicial, not agency, interpretation.

In addition, there is no indication that Congress expressly or impliedly delegated authority to interpret IIRIRA § 309(c)(1) to the INS; nor is that provision one for which the INS's expertise is informative. *See United States v. Mead Corp.,* 533 U.S. 218, 227–31, 121 S.Ct. 2164, 150 L.Ed.2d 292 (2001).

Finally, we reject the INS's suggestion that we are precluded from applying § 1231(a)(6) to Marquez because a bar to the prolonged detention of excluded aliens would "upset" a "long standing statutory scheme." *Kim Ho Ma v. Ashcroft,* 257 F.3d 1095, 1109 n. 22 (9th Cir.2001) (citing *Barrera–Echavarria,* 44 F.3d at 1446). *Barrera–Echavarria* involved detention under former § 1226(e), which is not at issue here. We have already determined in *Lin Guo Xi* that Congress's provision for the detention of inadmissible aliens under § 1231(a)(6) requires the application to inadmissible aliens of *Zadvydas's* six-month presumptive limit on detention. Our determination that aliens whose orders of exclusion became final pre-IIRIRA are similarly entitled to this presumptive limit because their detention is governed by § 1231(a)(6) thus upsets no long-standing statutory scheme, but instead applies the existing statute in a manner consistent with *Zadvydas, Lin Guo Xi,* and the express language of and Congressional intent behind IIRIRA § 309(c)(1).

## IV.

Because Marquez's detention is governed by § 1231(a)(6), and he has been detained beyond the six-month presumptively reasonable period indicated in *Zadvydas,* he is entitled to make a showing on remand that his removal to Cuba is not reasonably foreseeable. The government will have the opportunity to respond with evidence sufficient to rebut Marquez's showing. "[If] removal is not reasonably foreseeable, the [district] court should hold continued detention unreasonable and no longer authorized by statute." *Zadvydas,* 533 U.S. at 699–700, 121 S.Ct. 2491. At that point Marquez's release "may and should be conditioned on any of the various forms of supervised release that are appropriate in the circumstances, and [Marquez] may no doubt be returned to custody upon a violation of those conditions." *Id.* at 700, 121 S.Ct. 2491.

## CONCLUSION

We therefore reverse the denial of Marquez's habeas petition, and remand for further proceedings consistent herewith, including the appointment of habeas counsel.

AFFIRMED in part, REVERSED in part, and REMANDED.

BEEZER, Circuit Judge, concurring.

I concur in the opinion of the court because I am bound by the court's prior decision in *Lin Guo Xi v. INS*, 298 F.3d 832 (9th Cir.2002). *Lin Guo Xi* relies on the Supreme Court's opinion in *Zadvydas v. Davis*, 533 U.S. 678, 121 S.Ct. 2491, 150 L.Ed.2d 653 (2001). *Lin Guo Xi* holds that under 8 U.S.C. § 1231(a)(6), inadmissable aliens are entitled to the same reasonable time limitations against indefinite detention as are deportable aliens.

I write separately because the holding in *Lin Guo Xi*, including its interpretation of *Zadvydas*, is contrary to the express holdings of the majority of our sister circuits which consider 8 U.S.C. § 1231(a)(6). *See Benitez v. Wallis*, 337 F.3d 1289, 1298–1301 (11th Cir.2003) (per curiam); *Borrero v. Aljets*, 325 F.3d 1003, 1007 (8th Cir. 2003); *Rios v. INS*, 324 F.3d 296, 297 (5th Cir.2003); *Hoyte–Mesa v. Ashcroft*, 272 F.3d 989, 991–92 (7th Cir.2001), *cert. denied*, 537 U.S. 846, 123 S.Ct. 185, 154 L.Ed.2d 73 (2002); *see also Rosales–Garcia v. Holland*, 322 F.3d 386, 416–21 (6th Cir.2003) (Boggs, J., dissenting), *cert. denied*, —— U.S. ——, 123 S.Ct. 2607, 156 L.Ed.2d 627 (2003).